## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Monique C. Cullars-Doty as Special Administrator and Trustee for the Next of Kin of Marcus Ryan Cullars Golden; Ericka Cullars-Golden; and Pauline Cullars, | Case No. 21-cv-94 (NEB/ECW) |
| Plaintiffs, | |
| v. | ORDER |
| City of St. Paul; Ofc. Jeremy Doverspike; Ofc. Daniel Peck; Ofc. Sheila Lambie; Ofc. Jody Larsen; Ofc. Jean Barber; Ofc. Patrick Cheshier; Ofc. Benjamin Lego; Ofc. Charles Sims; and Sgt. Shawn Shanley; in their individual and official capacities, | |
| Defendants. | |

This matter is before the Court on Plaintiff's Motion to Amend the Complaint ("Motion") (Dkt. 27). For the reasons set forth below, the Motion is granted.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     General Background

On January 12, 2021, Plaintiffs initiated the present action under 42 U.S.C. § 1983, asserting in part that it arose "out of the January 14, 2015 fatal shooting of Marcus Ryan Cullars Golden resulting from a violation of his Constitutional rights by City of St. Paul and on-duty St. Paul police officers Jeremy Doverspike, and Daniel Peck. Plaintiff asserts these officers violated Marcus' well-settled federal civil rights

while acting under color of state law." (Dkt. 1 ¶ 2.) Plaintiffs in this action initially proceeded *pro se.* Counsel for Plaintiff made his first appearance in June 2021. (Dkt. 18.)

Plaintiffs filed the present Motion on October 1, 2021. The proposed amended complaint seeks primarily to reframe Count II from a claim that alleges the deprivation of Golden's rights under the Fourth Amendment and the Civil Rights Act of 1871, to a wrongful death claim against Defendants Doverspike and Peck related to the death of Golden based on the assertion that they either intended to cause the death of Golden when firing their weapons, or alternatively were perpetrating an eminently dangerous act without regard for Golden's life and that their actions were unlawful under Minnesota's authorized use of deadly force by police officers, Minn. Stat. § 609.066. (*See* Dkt. 27-6 at 10-11; Dkt. 33 at 8.)

Specifically, the current version of the proposed amended pleading alleges as follows: In the early morning hours of January 14, 2015, Marcus Golden drove unarmed to the apartment complex at 261 University Avenue in St. Paul. (Dkt. 33 ¶¶ 13-14.) Golden parked in the parking lot of the apartment and remained in his vehicle. (*Id.* ¶¶ 15-16.) An unidentified man inside of the apartment called 911 and reported that someone was texting threats to him.[1] (*Id.* ¶¶ 17-18.) Two squads, not including Doverspike and

---

[1]     Plaintiffs allege in the operative Complaint that a 911 caller "reported that someone was texting death threats to him." (Dkt. 1 ¶ 16.) However, the proposed amended complaint deletes the word "death" from this factual allegation, so that now it reads that a 911 caller reported "someone was texting threats to him." (Dkt. 33 ¶ 17.)

Peck (who went to the scene on their own volition), were dispatched to the apartment complex on a harassment complaint.  (*Id.* ¶¶ 19-20.)

Doverspike and Peck arrived in a squad without activating the siren or emergency lights, exited their vehicle, and began to approach Golden in his vehicle.  (*Id.* ¶¶ 22-23.) Golden attempted to drive around the officers and their vehicle.[2]  (*Id.* ¶ 24.)  Both officers opened fire on Golden's vehicle[3] during which he was shot twice: once in the left forearm, entering nearer the elbow than the wrist and exiting nearer the wrist than the elbow; while the other shot entered the back of Golden's skull.  (*Id.* ¶¶ 25-29.)

The wrongful death claim alleges that Doverspike and Peck intentionally fired their weapons at Golden even though he did not pose a threat of death or harm to them and did not pose an immediate threat of death or harm to others at the time he was shot; Doverspike and Peck's actions in firing their weapons was unlawful under Minn. Stat. § 609.066; Doverspike and Peck either intended to cause the death of Golden when firing

---

[2]     The proposed amended complaint continues to allege that Golden was attempting to flee when the officers fired their guns at him.  (*Id.* ¶ 68.)

[3]     The operative Complaint alleges that after the officer exited the vehicle and before the shots occurred the following occurred:

>     22.     Defendant Doverspike slipped on ice in the parking lot and his
>             weapon discharged.
>
>     23.     Defendant Peck stated in his police report that he heard a gunshot
>             and he believed Marcus had shot his partner because he could not
>             see his partner. He did not hear any screams from his partner or
>             requests for assistance.

(Dkt. 1 ¶¶ 22-23.)  These allegations have been removed from the proposed amended Complaint.

their weapons, or alternatively were perpetrating an eminently dangerous act without regard for Golden's life; and that as a result of their conduct, Golden lost his life.  (*Id.* ¶¶ 71-76.)

**B.     Appointment of Wrongful Death Trustee**

The operative Complaint and the initial proposed amended complaint both allege that "By order dated December 24, 2020, Ramsey County District Court Judge Sara Grewing appointed Monique Cassandra Cullars-Doty ('Cullars-Doty') as Special Administrator for the estate of Marcus Ryan Cullars Golden."  (Dkt. 1 ¶ 1; Dkt. 27-6 ¶ 1.) There was no mention in these pleadings that Cullars-Doty was also the wrongful death trustee pursuant to Minn. Stat. § 573.02, subdivision 3.  As part of its opposition, Defendants argued that the Motion should be denied as futile on the basis that the pleadings only allege that Cullars-Doty is Special Administrator for the estate of Golden, as opposed to the wrongful death trustee for the next of kin pursuant to Minn. Stat. § 573.02, subdivision 3, necessary to bring a wrongful death action.  (Dkt. 31 at 3.)

Minnesota's wrongful death statute provides in relevant part as follows:

> When death is caused by the wrongful act or omission of any person or corporation, **the trustee appointed as provided in subdivision 3** may **maintain an action** therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission.

Minn. Stat. § 573.02, subd. 1 (emphasis added).

Thus, under Minnesota law, in order to bring a claim for wrongful death, a plaintiff must be appointed as a wrongful death trustee pursuant to Minn. Stat. § 573.02, subdivision 3.  *See also* Minn. Stat. § 573.01 ("A cause of action arising out of an injury

to the person dies with the person of the party in whose favor it exists, **except as provided in section 573.02**.  All other causes of action by one against another, whether arising on contract or not, survive to the personal representatives of the former and against those of the latter.").

When Plaintiff's counsel was asked about this issue during the October 18, 2021 hearing, he represented that Cullars-Doty had been appointed as trustee for the heirs and kin of Golden in April 2021, and was willing to further amend the proposed amended complaint to reflect her appointment.  Defendants did not object to such an additional amendment, subject to their other arguments with respect to futility.  At the hearing, the Court ordered Plaintiffs to file a further redlined proposed amended complaint reflecting the appointment, and ordered the parties to provide the Court with supplemental briefing, which was completed on November 5, 2021.  (Dkts. 32-36.)

As part of the second version of the proposed amended complaint, Plaintiffs now allege that "By order dated April 20, 2021, the Honorable John Guthmann appointed Monique Cassandra Cullars-Doty as Trustee for the heirs and kin of Marcus Ryan Cullars Golden."  (Dkt. 33 ¶ 1.)  As such, the Court finds that Plaintiffs have sufficiently alleged that Cullars-Doty has standing, subject to the other arguments raised by Defendants, to bring the wrongful death action as the trustee.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."  The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court.  *See, e.g.*, *Niagara of*

*Wisconsin Paper Corp. v. Paper Indus. Union Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986) (citation omitted).  The Eighth Circuit has held that "[a]lthough amendment of a complaint should be allowed liberally to ensure that a case is decided on its merits . . . there is no absolute right to amend." *Ferguson v. Cape Girardeau Cty.*, 88 F.3d 647, 650-51 (8th Cir. 1996) (citing *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989); *Chesnut v. St. Louis Cty.*, 656 F.2d 343, 349 (8th Cir. 1981)).  Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Hillesheim v. Myron's Cards and Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) (citation omitted) ("A district court's denial of leave to amend a complaint may be justified if the amendment would be futile.").  "Although ordinarily the decision of whether to allow a plaintiff to amend the complaint is within the trial court's discretion, when a court denies leave to amend on the ground of futility, it means that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion. . . ." *In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir. 2007). "Accordingly, in reviewing a denial of leave to amend we ask whether the proposed amended [pleading] states a cause of action under the *Twombly* pleading standard. . . ." *Zutz v. Nelson*, 601 F.3d 842, 850-51 (8th Cir. 2010) (citation and marks omitted).  This includes on the grounds that a claimant lacks standing to raise the proposed claims.  *See Dalton v. Simonson Station Stores, Inc.*, No. 17-CV-4427 (SRN/LIB), 2018 WL 11025788, at *6 (D. Minn. Sept. 6, 2018).

Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Hillesheim v. Myron's Cards and Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) (citation omitted) ("A district court's denial of leave to amend a complaint may be justified if the amendment would be futile.").

On a motion to dismiss filed pursuant to Rule 12(b)(6), the Court must take the well-pleaded allegations of a claim as true, and construe the pleading, and all reasonable inferences arising therefrom, most favorably to the pleader. *See Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). To survive a motion to dismiss, a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]he face of the complaint ... include[s] public records and materials embraced by the complaint." *Noble Sys. Corp. v. Alorica Cent.*, LLC, 543 F.3d 978, 983 (8th Cir. 2008). A claim may be futile as untimely "'if it is clear from the face of the complaint that the claim is barred by the statute of limitations." *Untiedt's Vegetable Farm, Inc. v. S. Impact, LLC*, 493 F. Supp. 3d 764, 766-67 (D. Minn. 2020) (quoting *Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364, 367 (8th Cir. 2011)).

### III.   ANALYSIS

Given the further proposed amendment alleging that Cullars-Doty has been

7

appointed Trustee for the heirs and kin of Golden, the only issues before the Court are whether the proposed wrongful death action is time barred, whether murder can be addressed in a civil case, and whether the proposed amended complaint otherwise states claim for relief that is not futile. (*See* Dkt. 35.)  The Court addresses these arguments in turn.

## A.     Whether the Claim is Time-Barred

Minnesota's wrongful death statute provides as follows:

> When death is caused by the wrongful act or omission of any person or corporation, the trustee appointed as provided in subdivision 3 may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission.
>
> . . .
>
> An action to recover damages for a death caused by an intentional act constituting murder may be commenced at any time after the death of the decedent.  Any other action under this section may be commenced within three years after the date of death provided that the action must be commenced within six years after the act or omission.

Minn. Stat. § 573.02, subd. 1.

As alleged in the proposed amended Complaint, the wrongful death claim here arises out of the January 14, 2015 fatal shooting of Golden, and the present action was commenced almost six years later, on January 12, 2021.  As set forth previously, on April 20, 2021, Cullars-Doty was appointed as Trustee for the heirs and kin of Golden.  (Dkt. 33 ¶ 1.)  The plain language of section 573.02 provides that actions for wrongful death generally must be brought within three years after the decedent's death.  Minn. Stat. § 573.02, subd. 1; *see also Huttner v. State*, 637 N.W.2d 278, 283 (Minn. Ct. App. 2001).

8

Given that the present case was initiated, and the trustee was appointed, well after three years, the proposed wrongful death claim would be barred under the general statute of limitations found in section 573.02. *See Ortiz v. Gavenda*, 590 N.W.2d 119, 123 (Minn. 1999); *Huttner*, 637 N.W.2d at 283.

However, Plaintiffs argue that the "murder exception" to Minn. Stat. § 573.02, subdivision 1, applies to this case (Dkt. 34 at 3), which, as set forth above, provides: "An action to recover damages for a death **caused by an intentional act constituting murder** may be commenced at **any time after the death** of the decedent." Minn. Stat. § 573.02, subd. 1 (emphasis added). Defendants counter, in part, that the murder exception cannot apply to this case because there has been no prior criminal "determination" that Doverspike and Peck murdered Golden. (Dkt. 35 at 4.)

"The purpose of all statutory interpretation is to ascertain and effectuate the intention of the Legislature." *Haefele v. Haefele*, 837 N.W.2d 703, 708 (Minn. 2013) (citation omitted). When a statute's language is "plain and unambiguous, courts will look only to that language in ascertaining legislative intent." *Id*. Courts are to interpret statutes "as a whole," and "the words and sentences therein are to be understood . . . in the light of their context." *In re Dakota Cty.,* 866 N.W.2d 905, 909 (Minn. 2015) (marks and citation omitted). When reading a statute as a whole, a court must seek to "harmonize all its parts, and, whenever possible, no word, phrase or sentence should be deemed superfluous, void or insignificant." *Kremer v. Kremer*, 912 N.W.2d 617, 623 (Minn. 2018) (marks and citation omitted). Moreover, in interpreting a statute, a court may not add words or phrases to an unambiguous statute. *Walsh v. U.S. Bank, N.A.*, 851

9

N.W.2d 598, 604 (Minn. 2014) (citing *Cty. of Dakota v. Cameron*, 839 N.W.2d 700, 709 (Minn. 2013)).  Here, the plain language of the phrase "an intentional act constituting murder" inherently encompasses intentional murder with or without a prior conviction or other "determination."  If the Minnesota Legislature intended to allow wrongful death actions, based on an intentional act constituting murder, to proceed "any time after the death" only if there were a prior conviction or some other "determination" of murder, the legislature could have added language to that effect (e.g., required a "conviction of murder").  But the Court cannot add that language on Defendants' behalf.  *See Martinco v. Hastings*, 265 Minn. 490, 497, 122 N.W.2d 631, 638 (1963) ("If there is to be a change in the statute, it must come from the legislature, for the courts cannot supply that which the legislature purposefully omits or inadvertently overlooks.") (citations omitted).

Even assuming that section 573.02 is ambiguous in this regard, the "intention of the legislature may be ascertained by considering, among other matters . . . the circumstances under which it was enacted. . . ."  Minn. Stat. § 645.16(2).  Both parties cite to *Wartnick v. Moss & Barnett*, 490 N.W. 2d 108 (Minn. 1992), in support of their respective positions.  *Wartnick*, although involving a legal malpractice claim, provides insight into the circumstances surrounding the enactment of the murder exception to the three-year wrongful death statute of limitations:

> The underlying facts of this matter are as follows: Norman Wartnick was a shareholder and officer of Midwest, where the decedent was a salesperson between 1959 and 1972.  In 1970, Wartnick purchased from Prudential Life Insurance Company (Prudential) a $100,000 "key man" life insurance policy on the decedent's life, with Midwest as the named beneficiary.  The decedent left Midwest's employ in August 1972, and started a competing business.  On May 11, 1973, Wartnick paid the annual life insurance premium on the policy

to keep it in effect, despite the fact that the decedent was no longer an employee of Midwest.  On May 24, 1973, the decedent was shot in the head at close range, shortly after he arrived for work.  **No one was ever charged with the murder.**

After the decedent's death, Wartnick retained Gainsley to represent him and Midwest in connection with the claim for the life insurance proceeds. Gainsley also represented Wartnick in the on-going police investigation of the murder, advising him not to take a lie detector test, and recommending that Wartnick hire a criminal lawyer to assist Gainsley.  Prudential also investigated the murder and, after receiving notice that the Hennepin County Attorney's office would not be indicting Wartnick, paid the life insurance policy proceeds to Midwest.

Nachtsheim hired an attorney to represent her in a suit to obtain the insurance proceeds from Wartnick and Midwest.  She also wanted to sue Wartnick for wrongful death, because she believed that her husband had been killed for the insurance proceeds.  Her attorney was reluctant to bring a suit for wrongful death with so little evidence, and inadvertently let the wrongful death statute of limitations expire before bringing suit.  The attorney did, however, file a claim for unjust enrichment against Wartnick and Midwest in 1976.

During the discovery period of this civil suit, Wartnick was deposed. Gainsley and Wartnick have different accounts of the preparation and decisionmaking that took place prior to the deposition. Gainsley asserts that he researched the ramifications of having Wartnick plead the fifth amendment in response to any questions about the murder of the decedent. Gainsley also reports discussing the issue with other lawyers at his firm, and discussing it with Wartnick in "numerous phone conversations," and at a meeting several days before the deposition.  Gainsley asserts that Wartnick made an informed decision to take Gainsley's advice and plead the fifth. Wartnick does not remember meeting with Gainsley prior to the deposition, or receiving any information about the possible negative consequences of pleading the fifth.  The only meeting or conversation he remembers regarding the decision to plead the fifth was a meeting in the men's room immediately prior to the deposition.  There, according to Wartnick, Gainsley advised him to respond to any questions about the decedent's murder by asserting his fifth amendment privilege against self-incrimination.  He gave Wartnick a card to read at the appropriate times. Wartnick followed Gainsley's advice.

**Furnished with Wartnick's unresponsive answers in the deposition, Nachtsheim's attorney proceeded to lobby the legislature to amend the**

**wrongful death statute to remove any limitations period for actions to recover damages for "a death caused by an intentional act constituting murder." The attorney drafted and promoted this change as a victim's rights bill. After two unsuccessful attempts, and continued lobbying by the attorney, the bill passed. The amendment applied to "any death or cause of action arising prior to its enactment which resulted from an intentional act constituting murder."** 1983 Minn.Laws c. 347 § 3 subd. 4.

**No longer barred by the statute of limitations, Nachtsheim promptly brought a wrongful death action against Wartnick**. The unjust enrichment and wrongful death actions were consolidated by stipulation. Prudential, a party in the unjust enrichment suit, settled with Nachtsheim prior to trial. While preparing for the case, Gainsley offered Wartnick for another deposition if opposing counsel would agree not to use the first one. Nachtsheim's attorney refused. Gainsley relied principally on the police file and a deposition of Nachtsheim to gather information about the decedent's murder and construct a defense.

In his opening arguments at trial, Gainsley revealed that although Wartnick had been asked to take a polygraph examination regarding the murder, and was willing, Gainsley had advised against it. Because of his lack of an independent investigation and his reliance on the police reports, during the trial Gainsley had some difficulty getting information into the record. Wartnick's responses in the deposition were read to the jury, and Wartnick testified at the trial. **After being instructed that it could draw an adverse inference from Wartnick's fifth amendment assertions in the deposition, the jury found Wartnick had murdered or caused the murder of the decedent.**

*Wartnick*, 490 N.W.2d at 110-12 (footnote omitted) (emphases added).

In sum, the lawyer who lobbied the legislature on multiple occasions to amend the

wrongful death statute to remove any limitations period for actions to recover damages

for a death caused by an intentional act constituting murder was in the midst of seeking to

bring a wrongful death action based on a death where no criminal charges had been filed,

and thus no conviction or other determination of murder. The Court finds that this

supports an interpretation that the murder exception contains no conviction or

predetermination requirement. Defendants try to distinguish *Wartnick* on the basis that "there was no question that a murder had occurred. The decedent was shot at close range while at work in 1973." (Dkt. 35 at 4.) However, this argument contradicts Defendants' main premise that there needs to be a conviction or other legal determination that there was a murder in order to qualify for the murder exception. Indeed, no criminal charges were ever brought with respect to the *Wartnick* killing. Further, there appears no dispute in this case, in comparison to *Wartnick*, that at least one of the Defendants killed Golden, the question is whether the killing was murder and whether the act was justified.

The parties also cite to *Huttner v. State*, 637 N.W.2d 278 (Minn. Ct. App. 2001), *Silberstein v. Cordie*, 474 N.W. 2d 850 (Minn. Ct. App. 1991), and *American National Fire Insurance Co. v. Cordie*, 478 N.W.2d 531 (Minn. Ct. App. 1991), as to their respective positions.

In *Huttner*, a mentally-ill individual with a history of violence and civil commitment stopped taking all his medications against his psychiatrist's order. 637 N.W.2d at 281. When his social worker saw him, he represented to her that his psychiatrist had told him to stop taking his medications, however, the social worker neglected to confirm this assertion, which was false. *Id.* Soon thereafter, the mentally-ill individual killed Delores Fenske.[4] *Id.* at 282. The trustee sued the county, the social worker, and other persons and entities involved in the mentally-ill individual's treatment

---

[4]     The mentally-ill individual was found guilty of first-degree and second-degree murder. *See Davis v. State*, 595 N.W.2d 520, 522 (Minn. 1999).

on several theories, including a claim for wrongful death. *Id.* at 282. However, the defendants asserted that the wrongful death action was beyond the three-year statute of limitations. *Id.* The district court dismissed the wrongful-death action against the county and the social worker, determining that it was barred by the statute of limitations. *Id.* "The district court held that the legislature intended the murder exception to apply only to claims against the murderer and not to claims against others possibly liable for the murderer's actions on negligence theories." *Id.* at 283. The court of appeals reversed the finding:

> Clearly, an action to recover damages for a death caused by murder may be brought against persons other than the one(s) who actually inflict death. **The plain language of the murder-exception to the three-year limitation does not limit its application to the person(s) who commit the murder. To read the exception as only applicable to the murderer(s) would be to improperly read a provision into the statute that the legislature did not include.** *See Martinco v. Hastings*, 265 Minn. 490, 497, 122 N.W.2d 631, 638 (1963) ("If there is to be a change in the statute, it must come from the legislature, for the courts cannot supply that which the legislature purposefully omits or inadvertently overlooks."); *Tereault v. Palmer*, 413 N.W.2d 283, 286 (Minn. App. 1987) (stating that "the task of extending existing law falls to the supreme court or the legislature, but does not fall to this court"), *review denied* (Minn. Dec. 18, 1987). Persuasive as the district court's reasoning may be, we are constrained to interpret the law as written.

*Huttner*, 637 N.W.2d at 283 (emphasis added).

Defendants argue that there was a conviction of first-degree murder and attempted murder in *Huttner* prior to the civil wrongful death lawsuit, and for this reason the court held that the wrongful death action was an action to recover damages for a death caused by an intentional act constituting murder. (Dkt. 35 at 5.) However, there is no discussion in that decision of whether a conviction was necessary for the murder exception to apply.

Instead, the issue was whether claims against persons other than the murderer could qualify under the murder exception. If anything, *Huttner* supports a finding by this Court that if the Minnesota Legislature had intended to limit the exception to situations where there was conviction or other determination, it could have so specified.

In *Silberstein v. Cordie*, 474 N.W. 2d 850 (Minn. Ct. App. 1991), the court dealt with a motion for summary judgment. In that case, the defendant shot and killed the decedent and was tried for the crime. *Id.* at 853. The criminal trial court found the elements of first-degree murder were proved beyond a reasonable doubt. *Id.* In the capacity proceeding, the criminal trial court found Cordie not guilty by reason of mental illness. *Id.* Following the criminal trial, the trustee brought a wrongful death action and the defendant argued it was barred by the three-year statute of limitations. *Id.* The trial court certified the following question:

> Whether the exception to the three-year wrongful death statute of limitations for intentional acts constituting murder, as set out in Minn. Stat. § 573.02, applies in cases where the defendant has been found not guilty of murder by reason of mental illness?

*Id.* at 854. The court noted that in order to meet the murder exception it must be shown: (1) that the act was intentional; and (2) the acts must also constitute murder. *Id.* With respect to intent, the Court found that intent is an issue separate from mental capacity in the criminal context, and that the defendant's mental illness was irrelevant to the issue of intent for the purposes of the murder exception. *Id.* Based on this distinction, the Court held as follows:

> Based on this distinction, Cordie's mental illness is irrelevant to whether the killing was intentional. **It is sufficient** the element of intent was proven

15

beyond a reasonable doubt in the first phase of the bifurcated trial to satisfy the "intentional act" requirement of the limitation-period exception.

Our analysis does not end there. Not only must Cordie's act be intentional, it must also "constitute murder." Cordie argues his act did not "constitute murder" because he was found not guilty of murder by reason of mental illness. We disagree. When a statute's language is unambiguous, the letter of the law should not be disregarded to pursue the law's spirit. Minn. Stat. § 645.16 (1990). Words in a statute are construed according to their common and approved usage. Minn. Stat. § 645.08(1) (1990). Constitute is defined: "To be the elements or parts of; compose." The American Heritage Dictionary 314 (2d ed. 1982); *see also*, The Oxford English Dictionary 876 ("To make up, form, compose; to be the elements or material of which the thing spoken of consists"). Applying this definition, an "intentional act constituting murder" need only possess the elements of murder, that is, "causes the death of a human being with premeditation and with intent to effect the death." *See* Minn. Stat. § 609.185(1) (1990). The trial court, in the intent proceeding, found the elements of murder were proven beyond a reasonable doubt. Accordingly, the limitations period in the wrongful death statute does not bar a claim when the defendant is found not guilty by reason of mental illness.

*Id.* (emphasis added).

Defendants extend the holding of *Silberstein* to stand for the proposition that the only evidence that can support intent and a finding of murder is a criminal trial finding beyond a reasonable doubt as to intent and murder. However, the ruling in *Silberstein* is not that broad. While such a finding by a court in a criminal matter could satisfy the elements to apply the murder exception (*see generally*, *Fain v. Andersen*, 816 N.W.2d 696, 699 (Minn. Ct. App. 2012) (finding that as part of wrongful death action that collateral estoppel can attach to issues determined by a criminal proceeding)), it does not stand for the proposition that no other evidence can be considered. Indeed, under Minnesota law, the burden of proof of liability in a wrongful death action is the lesser "preponderance of the evidence" standard, as opposed to higher "beyond a reasonable

doubt" standard in the criminal context.  *See Thompson v. Hughart*, 664 N.W.2d 372, 376 (Minn. Ct. App. 2003) (citing *Carpenter v. Nelson*, 257 Minn. 424, 427, 101 N.W.2d 918, 921 (1960)); *State v. Coleman*, 560 N.W.2d 717, 723 (Minn. Ct. App. 1997).  As such, it is not surprising that the court in *Silberstein* found that a finding in the criminal context satisfied the evidentiary burden in the civil context.  Moreover, *Silberstein* makes it clear that to meet the definition of an "intentional act constituting murder," a party need only satisfy the elements of murder.  For purposes of the present Motion, the Court must primarily look at whether the proposed amended complaint satisfies those elements, not whether officers were criminally convicted of murder.  Under Defendants' reading of *Silberstein*, a trustee for the next of kin could not bring a civil wrongful death action in a situation where there was an acquittal, or where no charges were ever brought.  Such a reading is contrary to the plain meaning of section 573.02 and certainly contrary to *Wartnick, supra.*  It is also contrary to the Court of Appeal's comments regarding the remedial nature of the murder exception as it related to the *Silberstein* case later that year in *American National Fire Insurance Co. v. Cordie*, noting that, "the wrongful death statute and an exception to a limitations period **are remedial in nature and require a liberal construction**.  This is the construction, at least implicitly, this court advanced in concluding that the three-year limitations period did not bar the Silbersteins' wrongful death claim against Cordie."  478 N.W.2d at 535 (citations omitted) (emphasis added).

In sum, given the plain language of section 573.02, the circumstances under which the murder exception to the three-year statute of limitations was enacted, and the remedial nature of the wrongful death statute, the Court finds that a prior determination

17

of guilt is not necessary for a party, such as Cullars-Doty as the wrongful death trustee, to avail themselves of the murder exception to the statute of limitations.  As such, the Court will not find that the Complaint is futile on this basis.[5]

## B.     Whether a Determination of Murder Can Be Made in Civil Wrongful Death Claim

Defendants also take the position that there can be no determination that the crime of murder occurred in the present civil proceeding involving officer use of deadly force on the following basis:

> Similarly, a wrongful death claim under Minnesota state law does not involve criminal statutes or consideration of "murder."  *See e.g. Craighead v. Lee*, 399 F.3d 954, 963 (8th Cir. 2005) (noting that in state law claims for wrongful death decision to use deadly force is a discretionary decision entitling a police officer to official immunity absent a willful or malicious wrong and determining whether an officer committed a willful or malicious wrong, involves consideration of whether officer has intentionally committed an act that he had reason to believe is prohibited).  Thus, even if an officer were found liable under § 1983 or under Minnesota's wrongful death statute, that does not mean that the officer's actions constituted murder.

---

[5]     The Court acknowledges Defendants' argument that because the trustee in this case was appointed well after three years, a claim would also be barred under section 573.02 pursuant to the Minnesota Supreme Court's holding in *Ortiz, supra*.  (Dkt. 35 at 2-3.)  The court in *Ortiz* reaffirmed the holding that section 573.02 "requires the appointment of a trustee prior to the expiration of the 3-year statute of limitations, not the mere filing of a petition therefor within the statutory period." 590 N.W.2d at 123. However, *Ortiz* dealt with a traffic accident, and not a claim of murder.  *Id.* at 120.  The court will not extend the holding of *Ortiz* requiring the appointment of a trustee within three years of the decedent's death to claims involving murder, as that would render meaningless the language in the wrongful death statute, Minn. Stat. § 573.02, subd. 2, that "[a]n action to recover damages for a death caused by an intentional act constituting murder may be commenced at any time after the death of the decedent."  *See Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000) (quoting *Amaral v. St. Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn. 1999)) ("A statute should be interpreted, whenever possible, to give effect to all of its provisions; 'no word, phrase, or sentence should be deemed superfluous, void, or insignificant.'").

> Throughout their memorandum. Plaintiffs discuss various criminal statutes such as Minnesota statute § 609.19 and § 609.066 and identify what they "intend to prove" and that they have "met the pleading standard for murder under *Twombly*." Plaintiffs seem to be claiming that they can assert and prove criminal charges within the context of this civil lawsuit. This is not proper or appropriate under state or federal law.

(Dkt. 35 at 7-8 (citations omitted).)

As a starting point, the Court rejects the assertion that a wrongful death action for murder cannot be brought against law enforcement. There is no dispute that a wrongful death action to recover damages for a death in a civil action caused by an intentional act constituting murder may be asserted under section 573.02. Further, it is important to again emphasize that there is no exception in the language of section 573.02 for law enforcement. Moreover, no criminal charges will need to be proved in this case, as argued by Defendants (Dkt. 35 at 8), given that as the Court has already noted, the burdens of proof in the civil and criminal context are different. (*See supra*, Section III.A.) With respect to Defendants' argument regarding official immunity in the context of a wrongful death claim, the Eighth Circuit has recently summarized the defense as follows:

> "In Minnesota '[t]he official immunity doctrine provides that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong.'" *Hassan v. City of Minneapolis*, Minn., 489 F.3d 914, 920 (8th Cir. 2007) (quoting *Elwood v. Cty of Rice*, 423 N.W.2d 671, 677 (Minn. 1988)). A law enforcement officer's decision to use deadly force is a discretionary decision for which official immunity applies absent a showing of a willful or malicious wrong. *Id.* (citing *Maras v. City of Brainerd*, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993)). Malice under Minnesota law means an intentional act that a public official "had reason to believe is prohibited." *Johnson*, 901 F.3d at 972 (quoting *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994)).

*Birkeland as Tr. for Birkeland v. Jorgensen*, 971 F.3d 787, 792 (8th Cir. 2020). Even if

the officers' decision to shoot Golden, as alleged, amounted to a discretionary decision,

the issue still remains whether the act amounts to a willful or malicious wrong.

Defendants appear to intimate that officers could not be held liable for murder in the civil

context under the doctrine of official immunity. However, to the extent that Doverspike

and Peck did not have reason to believe that the use of force was justified when they shot

Golden, they would not be entitled to official immunity.[6]  *See Craighead v. Lee*, 399 F.3d

954, 963 (8th Cir. 2005). Official immunity is an affirmative defense. *See Stone v.

Badgerow*, 511 N.W.2d 747, 752 n.5 (Minn. Ct. App. 1994) (official immunity described

as affirmative defense), *rev. denied*, (Minn. Apr. 19, 1994). As set forth more fully

below, *infra*, the Court finds that the proposed amended complaint is not futile, as it is

not clear from the face of the proposed amended complaint what Doverspike and Peck

knew when or should have reasonably known when Golden was fleeing such that the

Court could conclude in the context of this Motion that their use of deadly force was

justified and that they had no reason to believe their actions were prohibited. *See Noble

Sys. Corp.*, 543 F.3d at 983 (citations omitted) ("If an affirmative defense such as a

privilege is apparent on the face of the complaint, however, that privilege can provide the

basis for dismissal under Rule 12(b)(6).")  While Doverspike and Peck may ultimately

---

[6]     In *Craighead*, the Court found that the officer was not entitled to qualified
immunity for a § 1983 excessive force claim under the Fourth Amendment nor official
immunity with respect to a wrongful death claim where the officer shot and killed a
suspect where there was a dispute of fact whether the suspect with a gun presented an
immediate threat of serious physical injury or death.  399 F.3d 954 at 961-63.

prevail on summary judgment or trial on such a defense, the allegations in the proposed amended complaint do not establish that the wrongful death claim is futile based on the affirmative defense of official immunity. *See Craighead,* 399 F.3d at 963 ("Whether or not an officer acted willfully or maliciously is usually a question of fact to be resolved by the jury.") (citation omitted).

## C.   Whether Plaintiffs Have Plausibly Stated a Wrongful Death Claim Based on Murder

Defendants concede that "[i]t is possible for a police officer to commit murder, and the exception could apply in that situation, but that is not the situation in this case." (Dkt. 35 at 9.)  Defendants claim that the allegations of murder in the proposed amended complaint are conclusory and contradictory.  (Dkt. 31 at 9-10; Dkt. 35 at 9-13.) Defendants direct the Court to the inconsistencies between the Complaint and the proposed amended complaint.  (Dkt 35 at 9.)  The first inconsistency relates to the nature of the call.  (*Id.* at 10.)  In the Complaint, Plaintiffs allege that a 911 caller "reported that someone was **texting death threats** to him."  (Dkt. 1 ¶ 16 (emphasis added).)  However, the proposed amended complaint deletes the word "death" from this factual allegation so that now it reads that a 911 caller reported "someone was texting threats to him" and that officers were dispatched to the apartment complex "on a harassment complaint."  (Dkt. 33 ¶¶ 17, 19.)  Moreover, as previously stated, the proposed amended complaint omits the allegations in the Complaint that after the officers exited the vehicle and before Golden was shot, Doverspike slipped on ice in the parking lot and his weapon discharged; and that Peck stated in his police report that he heard a gunshot and he

believed Golden had shot his partner because he could not see his partner, and did not

hear any screams from his partner or requests for assistance. (Dkt. 1 ¶¶ 22-23.) Instead,

the proposed amended complaint now alleges that Golden attempted to drive around

Doverspike and Peck and they opened fire on him, hitting him at least once from behind

in the head. (Dkt. 33 ¶¶ 24-29.) As previously stated, the proposed amended complaint

also added allegations that Doverspike and Peck intentionally fired their weapons at

Golden even though he did not pose a threat of death or harm to them and did not pose an

immediate threat of death or harm to others at the time he was shot; Doverspike and

Peck's actions in firing their weapons was unlawful under Minn. Stat. § 609.066;

Doverspike and Peck either intended to cause the death of Golden when firing their

weapons, or alternatively were perpetrating an eminently dangerous act without regard

for Golden's life; and that Golden lost his life as a result of their conduct. (*Id.* ¶¶ 71-76.)

Plaintiffs claim that they have adequately alleged the elements of murder in the

second degree. (Dkt. 34 at 5-6.) As a starting point, the Court finds that the proposed

amended complaint adequately alleges the elements of murder in the second degree for

the purposes of Rule 8(a). *See Silberstein*, 474 N.W.2d at 854 ("an 'intentional act

constituting murder' need only possess the elements of murder."). Second-degree

intentional murder has two elements: (1) causing the death of a human being and

(2) intent to effect the death of that person or another, without premeditation. Minn. Stat.

§ 609.19, subd. 1(1) (2014). There is no dispute that the proposed amended complaint

alleges that Doverspike and Peck fired their weapons directly at Golden as he went

around them in a car and that Golden died due to wounds caused by those gunshots.

Defendants argue that Plaintiffs' proposed amended complaint contradicts facts alleged in the Complaint, namely that the shooting took place when Doverspike slipped and his weapon discharged and that Peck assumed the shot came from Golden and opened fire. (Dkt. 1 ¶¶ 22-24, 67.)  Defendants rely on *ecoNugenics, Inc. v. Bioenergy Life Science, Inc.*, which found that a "[c]ourt must consider facts previously asserted by ecoNugenics, for 'leave to amend is [only] warranted if the deficiencies can be cured with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint." 355 F. Supp. 3d 785, 794 (D. Minn. 2019) (quoting *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011)) (citations omitted).  This case is distinguishable from *ecoNugenics*, as the initial Complaint was drafted by *pro se* litigants.  (Dkt. 30 at 1.)  Counsel for Plaintiffs did not make an appearance until June 23, 2021.  (Dkt. 18.)  While the initial *pro se* Complaint specifically relied on the police officers' reports, it is not unreasonable or inconsistent for allegations in the proposed amended complaint, based on further investigation, to challenge the officers' version of events (especially in light of the death of the other main witness).[7]  It would be a different situation if the Plaintiffs were changing allegations that were based on facts that were primarily in their possession when they filed the Complaint.  Unlike the litigants in *ecoNugenics*, the Court does not discern a bad faith on the part of Plaintiffs for making these amended allegations, and the Court will not find

---

[7]     The Court presumes Plaintiffs and their counsel have a Rule 11 basis for the allegations in their proposed amended complaint, and Defendants have not argued to the contrary.

the allegations futile on this basis.[8]

That said, this does not end the analysis.  The parties argue whether the proposed amended complaint's claim of murder for the purposes of the wrongful death action is futile under Minnesota's Authorized Use of Deadly Force by Peace Officers statute, Minn. Stat. § 609.066.  The parties both agree that the Court should look at the version of section 609.066 in effect at the time of the January 2015 shooting of Golden, which provides that the use of deadly force by a peace officer in the line of duty is justified only when necessary to:

> (1) to protect the peace officer or another from apparent death or great bodily harm;
>
> (2) to effect the arrest or capture, or prevent the escape, of a person whom the peace officer knows or has reasonable grounds to believe has committed or attempted to commit a felony involving the use or threatened use of deadly force; or
>
> (3) to effect the arrest or capture, or prevent the escape, of a person whom the officer knows or has reasonable grounds to believe has committed or attempted to commit a felony if the officer reasonably believes that the person will cause death or great bodily harm if the person's apprehension is delayed.

Minn. Stat. § 609.066, subd. 2 (2015).[9]  Any reliance by Doverspike and Peck on section 609.066 in defense of a claim of murder is an affirmative defense.  *See State v.*

---

[8]     For the same reasons, the Court does not find that these amendments are futile with respect to the officers' claimed affirmative defense that their use of deadly force was authorized under Minn. Stat. § 609.066, subd. 2(1), presumably under the theory that the officers had a reasonable belief that their lives had been threatened by Golden.  (Dkt. 35 at 10-11.)

[9]     The Court notes that Minn. Stat. § 609.066 was amended in 2020, with an effective date of March 1, 2021.

*Noor*, 955 N.W.2d 644, 659 (Minn. Ct. App.), *rev'd and remanded on other grounds by,* 964 N.W.2d 424 (Minn. 2021).

In support of the defense, Defendants point to the Complaint's allegation that a 911 caller "reported that someone was texting **death** threats to him." (Dkt. 1 ¶ 16 (emphasis added)), whereas the proposed amended complaint deletes the word "death" from this factual allegation so that now it reads that a 911 caller reported "someone was texting threats to him" (Dkt. 33 ¶ 17). The Court notes that Defendants are correct that the proposed amended complaint continues to allege that Golden was attempting to flee the police when he was shot. (*Id.* ¶ 68.)

This proposed amendment seeking to remove the word "death" is a closer call. The amendment appears aimed at defeating the affirmative defense under Minn. Stat. § 609.066, subd. 2(2)-(3), which deals with a fleeing suspect. Moreover, the nature of the threat as alleged in the proposed amended complaint, as opposed to the original allegation of death threats, is inconsistent with the transcript of the 911 call, which provides:

> **911:**      Thank you. Hello?
>
> **Caller:**   Ah there's a guy in the parking lot that's been ah texting me death threats for hours and he's got a gun and he's in my parking lot right now in a green jimmy.

(Dkt. 36-1 at 1.) The Court agrees with Defendants that the transcript of the 911 call is necessarily embraced by the pleadings given that the Complaint and proposed amended complaint refer to the call, and Plaintiffs have had an opportunity to dispute the

authenticity of the transcript and have not done so as of the date of this Order.[10]  *See*

*Ashanti v. City of Golden Valle*y, 666 F.3d 1148, 1151 (8th Cir. 2012) ("Documents

necessarily embraced by the pleadings include "documents whose contents are alleged in

a complaint and whose authenticity no party questions, but which are not physically

attached to the pleading.") (quoting *Kushner v. Beverly Enters., Inc*., 317 F.3d 820, 831

(8th Cir. 2003)) (citation omitted).  However, even assuming that the Court rejects the

allegations in the proposed amended complaint regarding the nature of the threat, this

does not necessarily make the proposed amendment futile with respect to the allegations

of murder.  As stated previously, reliance by Doverspike and Peck on section 609.066 in

defense of a claim of murder (in addition to a statute of limitations defense and official

immunity) is an affirmative defense.  If an affirmative defense "is apparent on the face of

the complaint . . . [it] can provide the basis for dismissal under Rule 12(b)(6)."  *Zean v.*

*Fairview Health Servs.,* 858 F.3d 520, 526 (8th Cir. 2017) (citations omitted).  In order to

prevail on the assertion that their use of deadly force was justified under Minn. Stat.

§ 609.066, subd. 2(2)-(3), it will need to be shown that Doverspike and Peck had

reasonable grounds to believe that the fleeing Golden had committed or attempted to

**commit a felony involving the use or threatened use of deadly force** or that he would

cause death or great bodily harm if his apprehension was delayed.  The complaints do not

set forth what Doverspike and Peck knew at the time they shot Golden.  The Complaint

only states that officers were dispatched to the apartment complex and that Doverspike

---

[10]    The Court notes that a written transcript of audio 911 call is publicly available,
and therefore available to Plaintiffs' counsel.  *See* Minn. Stat. § 13.82, subd. 4.

and Peck also arrived on scene even though they were not dispatched.  (Dkt. 1 ¶¶ 18-19.)
The proposed amended complaint adds that they were only dispatched on a harassment
complaint and there is no indication in the Complaint or proposed amended complaint as
to what dispatch told them or other officers regarding the nature of the harassment,
including whether it amounted to making death threats.[11]  Given that the proposed
amended complaint does not include what Doverspike and Peck knew at the time they
shot Golden, the Court cannot find that the murder claim is futile based on a justified use
of force.  That said, there is nothing precluding Defendants from seeking summary
judgement, even early partial summary judgement, to the extent that discovery supports
the defense.

For all of the reasons stated above, the Court finds that the proposed amended
complaint is not futile and grants the motion to amend.

## IV.   ORDER

Based upon on the motion and the documents filed under seal, as well as all the
files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Plaintiffs' Motion to Amend the Amended Complaint (Dkt. 27) is
**GRANTED**.

2.     On or before **December 24, 2021**, Plaintiffs shall file and serve their

---

[11]     Defendants concede that "While sending harassing text **messages may be a gross
misdemeanor** in Minnesota, sending texts threatening death or to kill someone are
terroristic threats constituting 'crimes of violence' under Minnesota law and are felonies.
Minn. Stat. § 609.713; Minn. Stat. § 609.02."  (Dkt. 35 at 12 (emphasis added).)  Thus,
the nature of the threats is relevant to Defendants' futility arguments.

Second Amended Complaint in substantially the same form (without redline) as the

proposed amended complaint (Dkt. No. 33-1) submitted with this Motion.

      3.    Defendants shall respond to the Amended Complaint in a manner consistent

with the Federal Rules of Civil Procedure and the Local Rules.


Dated: December 10, 2021                       *s/Elizabeth Cowan Wright*
                                                ELIZABETH COWAN WRIGHT
                                                United States Magistrate Judge