UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Monique C. Cullars-Doty as Special Administator and Trustee for the Next of Kin of Marcus Ryan Cullars Golden; Ericka Cullars-Golden; and Pauline Cullars,<br><br>        Plaintiff,<br><br>vs.<br><br>City of St. Paul; Ofc. Jeremy Doverspike; Ofc. Daniel Peck; Ofc. Sheila Lambie; Ofc. Jody Larsen; Ofc. Jean Barber; Ofc. Patrick Cheshier; Ofc. Benjamin Lego; Ofc. Charles Sims; and Sgt. Shawn Shanley; in their individual and official capacities,<br><br>        Defendants. | Court File No. 21-CV-00094<br><br><br><br>**SECOND AMENDED COMPLAINT WITH JURY DEMAND** |

# INTRODUCTION

For her Complaint, Monique Cassandra Cullars-Doty, in her capacity as Special Administrator and Trustee for the estate of Marcus Ryan Cullars Golden, and Plaintiffs Ericka Cullars-Golden and Pauline Cullars state and allege as follows:

1. By order dated December 24, 2020, Ramsey County District Court Judge Sara Grewing appointed Monique Cassandra Cullars-Doty as Special Administrator for the estate of Marcus Ryan Cullars Golden. By order dated April 20, 2012, the Honorable John Guthmann appointed Monique Cassandra Cullars-Doty as Trustee for the heirs and kin of Marcus Ryan Cullars Golden.

1

2. This is an action for money damages arising out of the January 14, 2015 fatal shooting of Marcus Ryan Cullars Golden by on-duty St. Paul police officers Jeremy Doverspike, and Daniel Peck.

3. Further, this action is for money damages against the City of St. Paul and St. Paul police officers Jody Larsen, Patrick Cheshier, Jean Barber, Benjamin Lego, Charles Sims, Sheila Lambie and Sgt. Shawn Shanley for the unreasonable search and seizure of Plaintiff Pauline Cullar

4. Further, this action is for money damages for the unreasonable search and seizure and false imprisonment of Plaintiff Erika Cullars-Golden.

5. Plaintiffs further assert a claim against City of St. Paul under *Monell v. Department of Social Services*, 436 U.S. 658 (1975), and *Canton v. Harris*, 489 U.S. 378 (1989).

## JURISDICTION AND VENUE

5. This Court has original jurisdiction to hear this complaint and to adjudicate the claims stated herein under the Civil Rights Act of 1871, Title 42, §1983 to redress and enjoin the illegal practices alleged in this Complaint. This Court also has supplemental jurisdiction over plaintiff's state law claims pursuant to Title 28, United States Code, §1367.

6. Venue is proper in the District of Minnesota because Defendant City of St. Paul is located in this district, the other individually named defendants are employed in this district, and the incidents in question occurred in this district.

## PARTIES

7. Plaintiff's decedent, Marcus Ryan Cullars Golden ("Marcus") was a resident of St. Paul when he died as a result of homicide by St. Paul police on January 14, 2015.

8. Plaintiff Monique Cassandra Cullars-Doty ("Monique") has been designated as Special Administrator for purposes of commencing this action and was at all material times a resident of the State of Minnesota.

9. Plaintiff Ericka Cullars-Golden ("Ericka") is the biological Mother of decedent Marcus Ryan Cullars Golden and was at all material times a resident of the State of Minnesota.

10. Pauline Cullars ("Ms. Cullars") is the maternal Grandmother of decedent Marcus Ryan Cullars Golden and was at all material times a resident of the State of Minnesota.

11. Defendant Police Officers Jeremy Doverspike ("Doverspike"), Daniel Peck ("Peck"), Jody Larsen ("Larsen"), Jean Barber ("Barber"), Patrick Cheshier ("Cheshier"), Benjamin Lego ("Lego"), Charles Sims ("Sims"), Sheila Lambie ("Lambie") and Sgt. Shawn Shanley ("Shanley"), were at all times relevant to this complaint duly appointed and acting officers of the police department of the City of St. Paul, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Minnesota and/or the City of St. Paul.

12. The City of St. Paul ("St. Paul" or "The City"), Minnesota, is a municipal corporation and the public employer of the Defendant Officers. Defendant St. Paul is sued directly and also on the theories of respondeat superior or vicarious liability and pursuant to Minn. Stat. § 466.02, for the actions of its officers and officials, including the Defendant Officers.

**FACTS**

13. In the early morning hours of January 14, 2015, Marcus Ryan Cullars Golden drove to the apartment complex at 261 University Avenue in St. Paul.

14. Marcus was unarmed.

15. Marcus parked at the west end of the parking lot, where there was no outlet.

3

16. Marcus remained in his vehicle.

17. An unidentified man called 911 and reported that someone was texting threats to him.

18. The 911 caller indicated he was inside the apartment building.

19. Two squads, 223T with officers Rutschow and Thoo, and 221T with officers Banick and Lee, were dispatched to the apartment complex on a harassment complaint.

20. Defendant officers Jeremy Doverspike and Dan Peck were not dispatched to the apartment complex but went to the scene on their own volition.

21. Upon information and belief, Defendants Doverspike and Peck did not notify dispatch that they were going to the apartment complex.

22. Defendants Doverspike and Peck arrived in a squad without activating the siren or emergency lights.

23. Defendants Doverspike and Peck exited the squad vehicle and began to approach Marcus in his vehicle.

24. Marcus attempted to drive around the officers and their vehicle.

25. Both officers opened fire on Marcus' vehicle.

26. Marcus' vehicle was struck in the side and rear.

27. Marcus was shot twice.

28. One shot struck Marcus in the left forearm, entering nearer the elbow than the wrist and exiting nearer the wrist than the elbow.

29. One shot entered the back of Marcus' skull.

30. Officers Sandell and Karst-Adams called for an ambulance.

31. Officers instructed the paramedics to park on the street outside of the parking lot and at the front of the building.

32. This was the opposite side of the building from where Marcus was located and required the paramedic to go up a steep hill with a stretcher and equipment and walk nearly a block to get to Marcus.

33. This delayed medical care to Marcus, who was still alive when paramedics arrived.

34. Marcus died of gunshot wounds inflicted by Defendant Doverspike or Defendant Peck, or both.

35. Police leadership contacted Marcus' mother, Ericka Cullars-Golden, a 22-year veteran reserve St. Paul police officer and sergeant, sometime that morning.

36. Ericka was at her other job in downtown St. Paul at the time.

37. Defendant St. Paul police officers Jody Larsen and Patrick Cheshier went to Ericka's work place and questioned her on whether Marcus owned a gun.

38. Eventually, Defendants Larsen and Cheshier notified Ericka of her son's death.

39. Defendants Larsen and Barber transported Ericka to Regions Hospital.

40. Defendants Larsen, Chesier and Barber were wearing St. Paul Police uniforms at the time of contacting Ericka and transporting her to Regions Hospital.

41. Ericka's purse, cellular telephone and lunch bag were seized from her and placed in the trunk of the squad car.

42. Upon arrival at the hospital, Ericka was involuntarily placed in the psychiatric unit.

43. Ericka was unable to reach her family while in the psychiatric unit.

44. Ericka was held in the psychiatric unit for about three hours.

45. At approximately 8:00 am, Defendant officers Lego and Sims arrived at the home of Marcus' grandparents.

46. Marcus' grandmother, Pauline Cullars was at home alone as her husband was in the hospital.

47. Marcus lived in a room in his grandparent's home as he provided care and assistance to his grandparents.

48. Defendants Lego and Sims entered and sat down in the living room.

49. Defendants Lego and Sims were dressed in St. Paul Police uniforms.

50. Ms. Cullars did not feel that she could prevent Officers Lego and Sims from entering or staying. She also did not feel free to leave.

51. Defendants Lego and Sims told Ms. Cullars that Marcus had died at 2:30 am that morning but wouldn't elaborate. Ms. Cullars asked many times for an explanation but the Defendants refused to provide one.336

52. Defendants Lego and Sims remained in the home for about two hours, until a warrant could be obtained to search the home.

53. Defendants Lambie and Shanley arrived at Ms. Cullars' home about two hours later with a search warrant for electronics, weapons and other items.

54. However, as Defendant Lambie searched Marcus' room, she found t-shirts and other items commemorating the death of Marcus' brother in the closet and in other storage areas.

55. Rather than simply searching for the items listed on the warrant, Defendant Lambie arranged the commemorative items on the wall, around the bed and about the room, to imply that Marcus had created a shrine to his brother and that Marcus wanted to commit "suicide by cop."

56. A photograph of Marcus' room, with the shrine created by Defendant Lambie, was published in the St. Paul Pioneer Press.

57. Upon information and belief, Defendant Shanley took the photograph.

58. Defendant Lambie found a gun box in Marcus' room.

59. As a result of conduct by Defendants, Marcus lost his life and the Plaintiffs and the rest of Marcus' family have suffered loss of physical and emotional care, diminished quality and enjoyment of life, and mental/emotional trauma, anguish, and distress. Plaintiffs seek recovery of reasonable damages in an amount greater than $100,000.00.

## HISTORY OF THE ST. PAUL POLICE DEPARTMENT

60. Thomas Smith was the St. Paul Police Chief during the period from 2010 through early 2016.

61. During that period, the St. Paul Police Department ("SPPD") became the deadliest department in the State of Minnesota in terms of police killings of civilians (Stolen Lives Database, Communities United Against Police Brutality).

62. During that period, the SPPD was the 19th deadliest police department in the country with a rate of police killings per 1M population of 5.4. (Mapping Police Violence).

63. Of the 17 people killed by the SPPD during that period, 14 (82%) were people of color (Mapping Police Violence). People of color make up 33.3% of St. Paul's population (Wikipedia).

64. Despite high rates of use of deadly force, not a single SPPD officer who used deadly force during that period was disciplined or prosecuted (Police Complaint Database, Communities United Against Police Brutality).

65. On information and belief, SPPD investigations into deadly force incidents by its officers were designed to absolve officers who engaged in deadly force of accountability for their actions.

## CLAIMS FOR RELIEF

### COUNT 1: 42 U.S.C. § 1983 – FOURTH AND/OR FOURTEENTH AMENDMENT EXCESSIVE FORCE AGAINST DEFENDANTS DOVERSPIKE AND PECK

7

66. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

67. Defendants Doverspike and Peck were at all relevant times operating under color of law.

68. Defendants Doverspike and Peck violated Marcus Golden's Constitutional rights when they intentionally fired their guns at him while he was attempting to flee.

69. As a result of Defendant's constitutional violations, Marcus experienced pain and suffering, with damages as aforesaid.

### COUNT 2: WRONGFUL DEATH AGAINST DEFENDANTS DOVERSPIKE AND PECK

70. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

71. Defendants Doverspike and Peck intentionally fired their weapons at Marcus.

72. Marcus Golden did not pose a threat of death or great bodily harm to Defendants Doverspike or Peck at the time Defendants Doverspike and Peck fired their weapons at Marcus.

73. Marcus Golden did not pose an immediate threat of death or great bodily harm to others at the time Defendants Doverspike and Peck fired their weapons at Marcus.

74. Defendants Doverspike's and Peck's actions in firing their weapons was unlawful under Minnesota Statute 609.066.

75. Defendants Doverspike and Peck either intended to cause the death of Marcus when firing their weapons, or alternatively were perpetrating an eminently dangerous act without regard for Marcus' life.

76. By reason of their unlawful conduct described above, Marcus lost his life.

77. On information and belief, Marcus suffered pain and terror as a result of the Defendants unlawful conduct.

78. Marcus' next-of-kin have been deprived of Marcus' services in the care of his grandparents and their home, as well as the loss of consortium.

### COUNT 3: NEGLIGENCE AGAINST DEFENDANTS DOVERSPIKE AND PECK

79. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

80. After wounding Marcus, Defendants Doverspike and Peck, by their actions, prevented him from receiving timely medical care. Despite the apartment building being directly across the street from Regions Hospital, Marcus died while waiting to be transported to the hospital. He was declared dead on the scene.

81. Defendants Doverspike and Peck injured Marcus by their actions, causing him pain and suffering and leading to his death, with damages as aforesaid.

### COUNT 4: UNREASONABLE SEIZURE AND FALSE IMPRISONMENT IN VIOLATION OF THE FOURTH AMENDMENT AND THE CIVIL RIGHTS ACT OF 1871, TITLE 42 UNITED STATES CODE, §1983 AGAINST DEFENDANTS LARSEN, CHESHIER AND BARBER

82. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

83. At all relevant times, Defendants Larsen, Cheshier and Barber were acting under color of law.

84. After notifying Plaintiff Ericka of her son's death, Defendants Larsen, Cheshier and Barber used guile to falsely seize her and transport her to Regions Hospital.

85. Defendants Larsen, Cheshier and Barber then arranged for Ericka's false imprisonment through admission in the psychiatric unit of the hospital.

86. In arranging Erica's false imprisonment, Defendants Larsen, Cheshier and Barber violated Ericka's Constitutional rights.

87. As a result of these constitutional violations, Plaintiff Ericka suffered damages as aforesaid.

### COUNT 5: UNREASONABLE SEIZURE AND FALSE IMPRISONMENT IN VIOLATION OF THE FOURTH AMENDMENT AND THE CIVIL RIGHTS ACT OF 1871, TITLE 42 UNITED STATES CODE, §1983 AGAINST DEFENDANTS LEGO, SIMS, LAMBIE AND SHANLEY

88. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

89. Defendants Lego and Sims arrived at the home of Plaintiff Ms. Cullars on January 14, 2015 at approximately 8:00 am and entered her home.

90. Ms. Cullars did not believe she was free to refuse entry.

91. Defendants Lego and Sims then sat in her home for approximately two hours awaiting a search warrant.

92. Ms. Cullars did not believe she could demand they leave or that she was free to leave.

93. Defendants Lambie and Shanley arrived with a search warrant.

94. While searching Marcus' room, Defendant Lambie staged the room to create the appearance of a shrine to Marcus' deceased brother.

95. Defendant Shanley then took a picture of the room, which was later released to the media as part of crafting a narrative to justify the shooting death of Marcus Golden.

96. Defendants Lego and Sims violated Ms. Cullars' Fourth Amensdment rights.

97. Defendants Lambie and Shanley violated Ms. Cullars' constitutional privacy rights.

### COUNT 6: 42 U.S.C. §1983–MONELL LIABILITY AGAINST THE CITY OF ST. PAUL

98. Plaintiff restates and realleges the foregoing paragraphs as though set forth here in full.

99. The St. Paul City Charter establishes that the St. Paul Police Department is Executive Department and provides that the Mayor of St. Paul oversees the functions of the department (City Charter—Chapter 9). The Police Chief is appointed by the Mayor and approved by the City Council (City Charter—Chapter 12) and is the head of the SPPD (St. Paul Police Department Manual—010.00).

100. The Mayor, the City Council, and the Police Chief had final policymaking authority with regard to establishing written policies and training programs governing the conduct of SPPD officers performing policing functions on behalf of the City.

101. The written policies and training established and/or approved by The Mayor, the City Council, and the Police Chief constitute the official policy of the City.

102. On information and belief, the City of St. Paul, acting by and through its Mayor and/or other policymakers, had knowledge of SPPD's unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

103. The City of St. Paul, acting by and through its Mayor and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from SPPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

104. On or prior to January 14, 2015, St. Paul, with deliberate indifference to the rights of citizens tolerated, permitted, failed to correct, promoted, fostered or ratified a number of customs, patterns, or practices that condoned officers treating people of color differently, including but not limited to implementing deadly force at a far higher rate against people of color who did not pose a threat to officers.

105. St. Paul had a duty to vet officers employment records and mental health before hiring, but failed to do so.

106. St. Paul had a duty to engage in thorough investigations designed to elicit the truth about officer culpability in deadly force incidents but failed to do so despite the City's knowledge of a high rate of deadly force incidents.

107. St. Paul had the power to terminate or appropriately discipline officers for misconduct, including excessive force but failed to do so despite the City's knowledge of a pattern of complaints and lawsuits regarding excessive force.

108. St. Paul had a duty to ensure its officers were properly trained to avoid the use of deadly force whenever possible, and to properly handle their service weapons to avoid accidental discharge of same. St. Paul failed to do so despite the City's knowledge of a pattern of complaints regarding deadly force.

109. St. Paul had a duty to ensure its officers were properly trained in the rights of citizens under the Fourth Amendment in order to avoid acts of unlawful seizure and false arrest. St. Paul failed to do so despite the City's knowledge that such failure could lead to its officers exceeding their lawful authority under the Fourth Amendment.

110. The unconstitutional policies, practices, and customs defined herein were the moving force behind the death of Marcus Ryan Cullars Golden and deprivation of his civil rights.

111. The unconstitutional policies, practices, and customs defined herein were the moving force behind the deprivation of civil rights of Plaintiffs Ericka Cullars-Golden and Pauline Cullars.

112. As a result of these constitutional violations, Plaintiffs suffered damages as aforesaid.

### COUNT 8: VICARIOUS LIABILITY AGAINST THE CITY OF ST. PAUL

113. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

114. The City of St. Paul is liable for Defendant officers' conduct under Minn. Stat. § 573.02 because they were acting within the scope of their employment when they caused decedent's death.

115. The officers' conduct occurred during working hours while conducting official business.

116. The officers' illegal conduct during the course and scope of their employment is imputable to the City of St. Paul as its agents under the vicarious liability doctrine.

117. As a result of these constitutional violations, Plaintiffs suffered damages as aforesaid.

### RELIEF REQUESTED

**WHEREFORE, Plaintiff requests that this Court grant the following relief:**

a. Issue an order granting Plaintiffs judgment against Defendants, finding that Defendants violated Plaintiffs federally protected constitutional and statutory rights as well as Plaintiffs common law rights under Minnesota state law;

b. Award of compensatory damages to Plaintiffs against all Defendants, jointly and severally;

c. Award of punitive damages to Plaintiffs, pursuant to *Smith v. Wade*, 461 U.S. 30 (1983);

d. Award of such other and further relief as this Court may deem appropriate.

**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL.**

Dated: January 11, 2021

By: /s/ Monique C. Cullars-Doty
MONIQUE C. CULLARS-DOTY, *Pro Se*
3574 Bailey Ridge Alcove
Woodbury, MN 55125
Tel: 651-308-5409
Email: moniquecassandra@gmail.com

By: /s/ Ericka D. Cullars-Golden
ERICKA D. CULLARS-GOLDEN, *Pro Se*
243 Erie Street
St. Paul MN 55102
Tel: 651-307-2251
Email: erickagolden2001@yahoo.com

By: /s/ Pauline J. Cullars
PAULINE J. CULLARS, *Pro Se*
1268 Ashland Ave
St. Paul, MN 55104
Tel: 651-644-8511
Email: pcullars@hotmail.com